UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARY E. HUBBARD,                                    Case No. 1:15-cv-148
    Plaintiff,                                       Beckwith, J.
                                                    Litkovitz, M.J.
   vs.

COMMISSIONER OF                                     **REPORT AND**
SOCIAL SECURITY,                                    **RECOMMENDATION**
    Defendant.

Plaintiff Mary E. Hubbard brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits ("DIB").  This matter is before the Court on plaintiff's statement of errors (Doc. 6) and the Commissioner's response in opposition (Doc. 11).

**I.  Procedural Background**

Plaintiff protectively filed her application for DIB in November 2011, alleging disability since January 15, 2008 due to psoriatic arthritis, fibromyalgia, osteoarthritis, bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), and Ehlers-Danlos syndrome.  The application was denied initially and upon reconsideration.  Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Vincent Misenti.  Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing.  On September 25, 2013, the ALJ issued a decision denying plaintiff's DIB application.  On January 23, 2015, the Appeals Council denied plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] last met the insured status requirements of the Social Security Act on June 30, 2009.

2. The [plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of January 15, 2008 through her date last insured [("DLI")] of June 30, 2009 (20 CFR 404.1571 *et seq.*) (Exhibit 4D).

3. Through the date last insured, the [plaintiff] had the following severe impairment: fibromyalgia (20 CFR 404.1520(c)).

4. Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the [plaintiff] had the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) except she was limited to occasionally climbing ramps or stairs and never climbing ladders and scaffolds; occasionally kneeling; never crawling; no working around unprotected heights or around hazards such as moving mechanical parts; avoiding concentrated exposure to extreme temperatures; and avoiding concentrated exposure to fumes, odors, dusts, gases, unventilated areas, and chemicals.

6. Through the date last insured, the Vocational Expert credibly testified that the [plaintiff] was capable of performing past relevant work as a bank teller, DOT 211.362-018, which is light in exertional demands and skilled (SVP-5), and as a customer service clerk, DOT 205.362-026, which is light in exertional demands and skilled (SVP-6). This work did not require the performance of work related

3

activities precluded by the [plaintiff]'s residual functional capacity (20 CFR 404.1565).

7. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from January 15, 2008, the alleged onset date, through June 30, 2009, the date last insured (20 CFR 404.1520(f)).

(Tr. 16-21).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

4

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

*Dr. Modrall*

Psychologist Chris Modrall, Ph.D., first saw plaintiff in September 2005. (Tr. 248). At that time, plaintiff worked as a bank teller for First Financial. (*See* Tr. 248-49). Dr. Modrall diagnosed plaintiff with bipolar disorder but indicated that she had been doing better on mood stabilizers. (Tr. 248). Plaintiff sought treatment from Dr. Modrall because of the following problems:

> [D]ifficulty learning new tasks at work, making more mistakes than the average teller, straining friendships because people got worn out with [her] high energy style, having trouble paying bills on time, never getting around to balancing [her] checkbook, losing things, having piles of things in the house and never being able to put things back in their correct position, and having multiple speeding tickets.

(Tr. 249). Dr. Modrall asked plaintiff, plaintiff's husband, and plaintiff's mother to complete the Conners' Adult ADHD Rating Scale concerning plaintiff's behaviors. Their responses were significant for inattention/memory problems, hyperactivity/restlessness, impulsivity/emotional lability, and problems with self-concept. (*Id.*).

Dr. Modrall also administered the Wechsler Adult Intelligence Scale, Third Edition to evaluate plaintiff's attention and concentration. (Tr. 250). While plaintiff's "overall scores did not demonstrate any particular difficulties with attention and concentration," in the thirteen subtests she "did demonstrate some of the difficulties that are usually seen in people with attention and concentration" deficits. (*Id.*). For example, Dr. Modrall indicated that plaintiff "tended to move quickly and give impulsive answers," which "resulted in missing easy questions

5

and getting more difficult questions correct." (*Id.*).  Plaintiff frequently needed to have questions repeated, especially "on questions where [she was] asked to hold a significant amount of information in memory." (*Id.*).  Dr. Modrall determined that "[i]t was impossible for [her] to both hold information in memory and use it for computation.  The initial computation was distracting and by the time [she] had completed it [she] had forgotten the rest of the information." (*Id.*).  Dr. Modrall also administered the Visual Search and Attention Test, and plaintiff performed at the second percentile, "significantly lower" than expected.  (Tr. 251).  On the Rapidly Recurring Target Figure Test, plaintiff's error rate was within normal limits on one section, but her time was one standard deviation longer than the mean.  On the other section, her time was within normal limits, but her error rate was half a standard deviation more than the mean.  On the Tower of Hanoi exercise, which measures executive functioning (i.e., "the ability to direct and maintain the focus of attention, to inhibit behavior, to plan, organize, and sequence skills, and to develop initiative and drive"), plaintiff finished in 4 minutes and 30 seconds and used 65 moves.  (*Id.*).  The average person finishes in 1 minute and 30 seconds and uses 35 moves.  Dr. Modrall indicated that plaintiff "had difficulty developing the pattern that one uses to move the pieces.  Even when [she] had developed the pattern, it was difficult for [her] to hold it in memory." (*Id.*).

Dr. Modrall diagnosed plaintiff with ADHD, Combined Type. (*Id.*).  Dr. Modrall suggested "some written resources and a local support group." (*Id.*).  Concerning medication, Dr. Modrall commented:  "I know we also talked about stimulant medication.  Unfortunately, since you also have a Bipolar Disorder, medication may not be a good choice for you.  While the medicine might be helpful, it might also exacerbate the symptoms of the Bipolar Disorder." (*Id.*).

6

_Dr. Miller_

Psychiatrist Michael Miller, M.D., saw plaintiff every two to three months beginning in May 2006. (Tr. 432). However, the treatment notes in the record from Dr. Miller begin in June 2009. (_See_ Tr. 446). In his treatment note on June 22, 2009, Dr. Miller indicated that plaintiff was stable but had chronic stressors in her life. (_Id._). Dr. Miller treated plaintiff with Trileptal (an anticonvulsant that can be used as a mood stabilizer for the treatment of bipolar disorder). (_Id._). The other treatment notes from Dr. Miller in the record are from after plaintiff's DLI. (_See_ Tr. 436-446). In November 2011, Dr. Miller opined that plaintiff "remains psychologically disabled" due to her bipolar disorder and psoriatic arthritis. (Tr. 289). He further opined that plaintiff "is incapable of sustaining employment." (_Id._).

Dr. Miller also completed a mental impairment questionnaire in August 2013. (Tr. 432-35). Dr. Miller assigned plaintiff a GAF score of 60[1] and diagnosed plaintiff with bipolar disorder, mixed and mental complications from fibromyalgia and arthritis. (_See_ Tr. 432). Dr. Miller indicated that he treated plaintiff with Trileptal and Lamictal (an anticonvulsant used to treat bipolar disorder). Further, Dr. Miller indicated that plaintiff "is vulnerable to agitation, disorganization, and inability to stay level. She can handle only minimal stress." (_Id._). Dr. Miller identified the following signs and symptoms of plaintiff's mental condition: (1) feelings of guilt; (2) difficulty concentrating; (3) "psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." _Id._ The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). _Id._ at 34. Individuals with GAF scores of 51 to 60 have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." _Id._

the abnormal mental state and loss of previously acquired functional abilities"; (4) bipolar syndrome; (5) hyperactivity; and (6) easy distractibility. (Tr. 433).

Dr. Miller indicated that plaintiff is unable to meet competitive standards as to the following mental abilities needed to do unskilled work: (1) sustain an ordinary routine without special supervision; (2) complete a normal workday and workweek without interruption from psychologically based symptoms; (3) perform at a consistent pace without an unreasonable number and length of rest periods; (4) respond appropriately to changes in a routine work setting; and (5) deal with normal work stress. (Tr. 434). Further, Dr. Miller indicated that plaintiff is seriously limited, but not precluded from doing unskilled work as to the following mental abilities: (1) remember work-like procedures; (2) understand and remember very short and simple instructions; (3) maintain attention for two hour segment; (4) work in coordination with or proximity to others without being unduly distracted; and (5) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Dr. Miller indicated that this assessment was medically supported because plaintiff is "pressured at times" and "truly unable to balance multiple stimuli." (*Id.*). Additionally, Dr. Miller indicated that plaintiff is unable to meet competitive standards as to the following mental abilities needed to do semiskilled and skilled work: (1) understand and remember detailed instructions; (2) carry out detailed instructions; and (3) deal with stress of semiskilled and skilled work. (*Id.*). Dr. Miller opined that plaintiff has moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, extreme difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation within a twelve-month period. (Tr. 435). While Dr. Miller indicated he began treating plaintiff in 2006, his opinion did not indicate whether it applied to the period between plaintiff's onset date and DLI. (*See* Tr. 432).

8

_Dr. Santhanam_

Plaintiff began seeing internist Uma Santhanam, M.D., in February 2008. (Tr. 282). Dr. Santhanam indicated that plaintiff had been seeing another doctor for many years who diagnosed her with fibromyalgia. (Tr. 283). In reviewing plaintiff's systems, Dr. Santhanam noted fatigue, chronic sleep problems, anxiety, joint pain, and a history of fibromyalgia. (_Id._). On physical examination, Dr. Santhanam indicated no abnormalities in plaintiff's gait, joints, range of motion, or upper/lower limbs. (Tr. 282). Dr. Santhanam concluded that plaintiff's fatigue was likely due to fibromyalgia, but noted that plaintiff had a high lab result for anti-nuclear antibody ("ANA"), which could be associated with lupus or other rheumatic diseases. (_See_ Tr. 241, 282). Thus, Dr. Santhanam determined plaintiff needed to see a rheumatologist for further evaluation. (Tr. 282).

In March 2008, Dr. Santhanam noted that plaintiff's "fatigue level seems worse lately and her joints hurt as well," but without joint swelling. (Tr. 281). In reviewing plaintiff's systems, Dr. Santhanam noted fatigue, depression, anxiety, joint pain, and fibromyalgia. (_Id._). On physical examination, Dr. Santhanam noted plaintiff was anxious. (Tr. 280). Dr. Santhanam indicated no abnormalities in plaintiff's gait, joints, range of motion, or upper/lower limbs. Dr. Santhanam concluded she could refer plaintiff to a rheumatologist to treat her chronic fatigue. (_Id._). In April 2008, Dr. Santhanam's physical examination showed plaintiff's gait was normal. (Tr. 279). Dr. Santhanam indicated plaintiff's chronic fatigue could be due to a connective tissue disorder. (_Id._).

At another 2008 appointment Dr. Santhanam indicated that plaintiff had been taking Naproxen (a nonsteroidal anti-inflammatory drug) daily for her fibromyalgia. (Tr. 277). In reviewing plaintiff's systems, Dr. Santhanam noted ankle/leg swelling, chronic fatigue, and

9

bipolar disorder. (*Id.*). On physical examination, Dr. Santhanam did not note any significant musculoskeletal findings. (Tr. 276). Dr. Santhanam indicated plaintiff's rheumatologist had prescribed Plaquenil (an antimalarial drug also used to reduce inflammation in the treatment of rheumatic diseases) for plaintiff's fibromyalgia. (*Id.*). In reviewing plaintiff's systems in June 2009, Dr. Santhanam noted fatigue as well as musculoskeletal injuries, pain, and decreased range of motion associated with a motor vehicle accident. (Tr. 275). The other treatment notes from Dr. Santhanam are from after plaintiff's DLI. (*See* Tr. 382-431).

In November 2011, Dr. Santhanam opined:

> [Plaintiff] will be unable to hold a job of any kind due to her multiple medical problems including chronic pain from fibromyalgia, psoriatic arthropathy, right hip osteoarthritis, bursitis, Ehlers-Danlos syndrome, psoriasis, bipolar disorder and ADHD. She does [follow up] with a rheumatologist and a psychiatrist for most of these conditions.

(Tr. 288). Dr. Santhanam also completed an RFC questionnaire in May 2012. (Tr. 291-94). Dr. Santhanam indicated she has been plaintiff's primary care physician since September 2006. (Tr. 291). Plaintiff's symptoms include chronic fatigue, joint pain, and muscle pain. Pain from fibromyalgia is present in most joints, including hand joints. Dr. Santhanam indicated plaintiff receives medications for arthritis from her rheumatologist and is also treated with Trileptal and Lamictal. (*Id.*). Dr. Santhanam opined that plaintiff is not a malingerer. (Tr. 292). She further opined that psychological conditions including depression and bipolar disorder contribute to the severity of plaintiff's physical condition. (*Id.*).

Dr. Santhanam opined that plaintiff's pain and other symptoms will frequently (i.e., during 34-66% of an 8-hour workday) interfere with the attention and concentration needed to perform simple tasks. (*Id.*). Dr. Santhanam indicated plaintiff is capable of only low stress jobs. Further, plaintiff can walk up to a block without rest or severe pain, can sit for 20 minutes at one

10

time before needing to get up, and can stand for 15 minutes at one time before needing to sit down or walk around. (*Id.*). Dr. Santhanam opined that plaintiff can sit and stand/walk for less than two hours total during a workday and must walk for five minutes after every twenty minute period during a workday. (Tr. 293). Dr. Santhanam indicated that plaintiff needs a job where she can shift position at will from sitting, standing, or walking and will need to take two unscheduled breaks of ten to fifteen minutes each workday. Dr. Santhanam opined that plaintiff can never lift more than ten pounds and can lift less than ten pounds only occasionally (i.e., 6-33% of an 8-hour workday). Plaintiff can frequently hold her head in static position, can occasionally look up or turn her head right or left, and can only rarely (i.e., 1-5% of an 8-hour workday) look down. (*Id.*). Further, Dr. Santhanam opined that plaintiff can occasionally twist or climb stairs, can rarely stoop/bend, and can never crouch/squat or climb ladders. (Tr. 294). Dr. Santhanam indicated that plaintiff can use her hands to grasp/turn/twist objects only 25% of the workday, can use her fingers for fine manipulation only 10% of the workday, and can use her arms for reaching only 25% of the workday. Dr. Santhanam opined that plaintiff would miss work more than four days a month as a result of her impairments and treatment. Dr. Santhanam indicated that her opinion concerning plaintiff's symptoms and limitations applied as of September 2006. (*Id.*).

*Dr. Mousa*

Upon referral from Dr. Santhanam, plaintiff began seeing rheumatologist Soha Mousa, M.D., on March 6, 2008. (Tr. 258). Dr. Mousa assessed plaintiff with history of a positive ANA, bilateral cheek flushing, arthralgias, increasing fatigue, symptomatic fibromyalgia, and symptomatic degenerative disk disease. (*Id.*). In describing plaintiff's history, Dr. Mousa indicated that plaintiff was diagnosed with fibromyalgia in 2000. (Tr. 259). Additionally,

11

plaintiff reported occasional swelling of her hands, knees, and ankles, as well as occasional morning stiffness lasting more than an hour. Plaintiff also reported increasing fatigue. Dr. Mousa began plaintiff on clobetasol propionate (a corticosteroid used to treat psoriasis and some autoimmune diseases) and Naproxen. (*Id.*). In reviewing plaintiff's systems, Dr. Mousa noted fatigue and bipolar disorder. (Tr. 260). On physical examination, Dr. Mousa noted normal gait and posture, no evidence of muscular wasting, and no evidence of any synovitis, swelling, warmth, tenderness, or limitation of motion of any upper or lower peripheral joints. (Tr. 260-61). Dr. Mousa indicated plaintiff was positive for 18 out of 18 tender fibromyalgia points. (Tr. 261).

On March 25, 2008, Dr. Mousa noted no improvement of plaintiff's symptoms after starting Naproxen. (Tr. 256). Dr. Mousa noted that plaintiff continued to have a facial rash, arthralgias, and photosensitivity with positive ANA. Dr. Mousa diagnosed plaintiff with systemic lupus erythematosus and started treating her with Plaquenil. (*Id.*). In reviewing plaintiff's systems, Dr. Mousa noted fatigue and rosacea. (Tr. 257). Dr. Mousa did not perform a physical examination. (*See id.*).

In June 2008, Dr. Mousa indicated plaintiff's lupus was mild and currently stable on her current medications. (Tr. 254). Plaintiff's fibromyalgia was symptomatic. Dr. Mousa indicated plaintiff had been exercising to improve her fibromyalgia and her "[f]atigue is somewhat improved however that seems to be her lingering symptom at this point in time." (*Id.*). Dr. Mousa started plaintiff on 25 milligrams of Lyrica (a central nervous system depressant used to treat fibromyalgia) and expected her to slowly increase her dosage to 100 milligrams by her next visit. (*Id.*). In reviewing plaintiff's systems, Dr. Mousa noted rosacea and ongoing fatigue. (Tr. 255). On physical examination, Dr. Mousa noted there was no evidence of synovitis, swelling,

warmth, tenderness, or limitation of motion, but indicated plaintiff was positive for 18 out of 18 fibromyalgia tender points. (*Id.*).

In July 2008, Dr. Mousa indicated plaintiff was only able to tolerate 25 milligrams of Lyrica at night and "had too much fatigue and grogginess during the day and when she tried to increase it to twice at night." (Tr. 252). Dr. Mousa indicated that "[s]ince last being seen in general she continues to do well. She has just been under a lot of stress." (*Id.*). In reviewing plaintiff's systems, Dr. Mousa noted rosacea and fatigue that was ongoing but improved. (Tr. 253). On physical examination, Dr. Mousa noted there was no evidence of synovitis, swelling, warmth, tenderness, or limitation of motion, but indicated plaintiff was positive for 18 out of 18 fibromyalgia tender points. (*Id.*).

In October 2008, Dr. Mousa indicated that plaintiff had been noticing improvement on Plaquenil and Lyrica "until two weeks ago when she had the sudden onset of severe fatigue, stiffness and discomfort." (Tr. 376). Plaintiff denied having any swollen joints but Dr. Mousa noted plaintiff was "having difficulty with ambulation stating that her gait is off." (*Id.*). Dr. Mousa ordered an MRI of the brain to evaluate for the possibility of multiple sclerosis. Dr. Mousa noted that plaintiff was "[u]nable to increase [L]yrica secondary to severe grogginess." (*Id.*). In reviewing plaintiff's systems, Dr. Mousa noted recurrent fatigue, rosacea, visual difficulty, and an unsteady gait. (Tr. 380). On physical examination, Dr. Mousa noted normal gait and posture, no evidence of synovitis, swelling, warmth, tenderness, or limitation of motion, and full range of motion of the axial spine. (Tr. 381). However, Dr. Mousa indicated plaintiff was positive for 18 out of 18 fibromyalgia tender points. (*Id.*).

In December 2008, Dr. Mousa noted:

Since last being seen [plaintiff has] noticed much improvement since starting 25 mg of [L]yrica at bedtime. However she's had a lot of weight gain and she's

13

concerned about this. The Lyrica does help her sleep and her generalized diffuse pain. Otherwise she's tolerating the [Plaquenil] well without side effects [or] difficulties.

(Tr. 368). In reviewing plaintiff's systems, Dr. Mousa noted rosacea and ongoing fatigue. (Tr. 374). On physical examination, Dr. Mousa noted normal gait and posture, no evidence of synovitis, swelling, warmth, tenderness, or limitation of motion, and full range of motion of the axial spine. (Tr. 374-75). However, Dr. Mousa indicated plaintiff was positive for 18 out of 18 fibromyalgia tender points. (Tr. 375).

In March 2009, Dr. Mousa noted:

Since last being seen, [plaintiff] states that over the last couple of weeks she's been getting worse. She's had a lot of stress and that has been impacting her sleep as well. She continues to [have] major complaints. Has some ongoing stiffness worse in the morning mainly involving her hands, low back and hips. Otherwise she is tolerating her medications well without side effects or difficulties.

(Tr. 362). Dr. Mousa discontinued Lyrica and began plaintiff on Flexeril (a muscle relaxer used to treat fibromyalgia). (*Id.*). In reviewing plaintiff's systems, Dr. Mousa noted bipolar disorder, rosacea, ongoing fatigue, and recurrent fevers at night. (Tr. 366-67). On physical examination, Dr. Mousa noted normal gait and posture, and no evidence of synovitis, swelling, warmth, tenderness, or limitation of motion in the peripheral joints. (Tr. 367). However, Dr. Mousa noted that plaintiff was overweight, had tenderness in the paraspinal muscle area, and was positive for 18 out of 18 fibromyalgia tender points. (*Id.*). The other treatment notes from Dr. Mousa are from after plaintiff's DLI. (*See* Tr. 300-61).

In November 2011, Dr. Mousa opined:

[Plaintiff] has been a patient of mine since March of 2008 having had a chronic history of fibromyalgia, psoriasis, and now with an inflammatory arthritis. Given her chronic illnesses, she has a significant amount of fatigue associated with it. Because of her arthritis, fatigue, and her other comorbid illnesses, [plaintiff] is unable to work outside of the house.

14

(Tr. 290).

*Non-examining State Consultative Physicians*

In March 2012, Carl Tishler, Ph.D., and Teresita Cruz, M.D., examined medical records from Dr. Santhanam and Dr. Mousa. (Tr. 66, 68, 71). They found that plaintiff suffered from the severe impairments of fibromyalgia and an affective disorder. (Tr. 67). However, they determined there was insufficient medical evidence to evaluate plaintiff's psychological symptoms and her credibility concerning them. (Tr. 69). Dr. Cruz opined that plaintiff's RFC was limited in the following ways as of her DLI: (1) occasionally lift 20 pounds; (2) frequently lift 10 pounds; (3) stand and/or walk for 6 hours in an 8-hour workday; (4) sit for 6 hours in an 8-hour workday; (5) occasionally climb ladders/ropes/scaffolds; and (6) avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 69-70). To justify her RFC assessment, Dr. Cruz cited Dr. Santhanam's diagnoses of plaintiff's conditions. (*See* Tr. 70-71). On reconsideration in June 2012, Aracelis Rivera, Psy.D., and Lynne Torello, M.D., examined the same medical records. (Tr. 75-77, 80). They reached the same conclusions as Dr. Tishler and Dr. Cruz and again cited Dr. Santhanam's diagnoses in support. (*See* Tr. 77-80).

**E. Specific Errors**

On appeal, plaintiff argues the ALJ failed to give proper weight to the medical opinions of her treating physicians. Plaintiff next argues the ALJ erred in failing to find that her mental impairments, psoriasis, and obesity were "severe." Plaintiff also contends the ALJ erred in failing to note plaintiff's extreme fatigue from her fibromyalgia in assessing her RFC. Plaintiff further argues the ALJ erred in assessing plaintiff's credibility, subjective complaints, and pain.

Finally, plaintiff contends the ALJ failed to pose a hypothetical to the VE that accurately accounted for the limitations from her mental conditions and fibromyalgia. (Doc. 6).

### 1. Substantial evidence does not support the ALJ's finding that plaintiff's mental impairments were non-severe.

Plaintiff argues the ALJ erred in not finding plaintiff's mental conditions to be "severe" impairments at step two of the sequential evaluation process. (Doc. 6 at 7). She notes the non-examining sources to whom the ALJ gave significant weight found her affective disorder to be a severe impairment. (*Id.* at 8). Plaintiff contends that in not finding her mental impairments, psoriasis, and obesity to be severe impairments, the ALJ failed to properly assess her work-related limitations. (*Id.* at 8-9).

The Commissioner responds that given the "scant" evidence about plaintiff's mental condition prior to her DLI, the ALJ reasonably concluded that her mental impairments were not severe during the relevant time period. (Doc. 11 at 6). The Commissioner contends the ALJ properly assessed Dr. Modrall's opinion in finding plaintiff was not prescribed medication for her ADHD and had no "particular difficulties with attention and concentration." (*Id.*). The Commissioner argues the ALJ "rightly noted that at the hearing, [plaintiff] testified that she stopped working because of fibromyalgia, and did not mention her mental impairments." (*Id.* at 7).

"[A]n impairment is considered 'severe' unless 'the [claimant's] impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 324 (6th Cir. 2015) (quoting Soc. Sec. Ruling 85-28, 1985 WL 56856, at *3 (1985)). The Sixth Circuit has "observed that the claimant's burden of establishing a 'severe' impairment during the second step of the disability

determination process is a 'de minimis hurdle.'" *Id.* at 324-25 (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "Under [this] prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* at 325 (quoting *Higgs*, 880 F.2d at 862).

The ALJ determined that only plaintiff's fibromyalgia was a severe impairment. (Tr. 16). The ALJ found there "is no treatment evidence to suggest that [plaintiff's] obesity has severely exacerbated any of [her] fibromyalgia symptoms." (*Id.*). The ALJ noted that Dr. Mousa "diagnosed psoriasis and reported [plaintiff] was doing well." (Tr. 17). As to plaintiff's mental impairments, the ALJ stated:

> The evidence does not support that [plaintiff] was limited by affective and organic mental disorders prior to her date last insured. [Plaintiff] was diagnosed with ADHD in March 2008 . . . and at that time she reported a history of bipolar disorder. [Plaintiff] did not seek mental health treatment until June 22, 2009, and was assessed stable at that time. . . . [Plaintiff] testified that she stopped working due to fibromyalgia symptoms.

(*Id.*). In assessing plaintiff's RFC, the ALJ did not include any work-related limitations associated with plaintiff's mental impairments. (*See id.*). In declining to include such limitations, the ALJ gave no weight to Dr. Miller's November 2011 opinion, finding that "[t]his assessment is after [plaintiff's] date last insured of June 30, 2009, and there are no treatment records to support a severe impairment prior to that date. Further, the determination of disability is reserved to the Commissioner." (Tr. 19). The ALJ gave little weight to Dr. Miller's August 2013 questionnaire, finding that "there are no treatment records from Dr. Miller in evidence prior to 2011." (*Id.*). The ALJ concluded that Dr. Miller's questionnaire was inconsistent with Dr. Modrall's evaluation, finding that plaintiff's "overall evaluation scores did not demonstrate any particular difficulties with attention and concentration but did reveal some difficulties with

memory." (*Id.*). The ALJ noted that Dr. Modrall did not recommend medication to treat plaintiff's ADHD and commented "that the claimant was doing better since [being] on mood stabilizers for her bipolar disorder." (*Id.*). The ALJ noted that plaintiff was never hospitalized for her psychiatric conditions and had never been diagnosed with more than moderate mental impairments, as evidenced by Dr. Miller's assigning a GAF of 60 in his August 2013 questionnaire. (*Id.*).

Here, substantial evidence does not support the ALJ's finding that plaintiff's mental impairments were not severe. The record as a whole, including the evidence from plaintiff's treating physicians and psychological providers, supports the conclusion that plaintiff's bipolar disorder and ADHD were more than a "slight abnormality" having more than a "minimal effect" on her work abilities. *See Winn*, 615 F. App'x at 324-25. Contrary to the ALJ's finding that plaintiff did not seek mental health treatment until June 22, 2009, the record shows that plaintiff received mental health treatment throughout the relevant period. (*See* Tr. 17). For example, Dr. Modrall's March 2008 assessment indicated that plaintiff first sought treatment from Dr. Modrall in September 2005. (Tr. 248). Dr. Modrall confirmed the diagnosis of bipolar disorder and noted that plaintiff was being treated with mood stabilizers. (*Id.*). In his August 2013 questionnaire, Dr. Miller indicated that he had been seeing plaintiff every two to three months since May 2006 and treating her bipolar disorder with Trileptal. (Tr. 432). While the first treatment note from Dr. Miller included in the record is from June 2009, treatment notes from Dr. Mousa and Dr. Santhanam show that plaintiff was taking Trileptal in June, July, October, and December 2008 and in March 2009, which supports Dr. Miller's statement that he was treating plaintiff prior to June 2009. (*See* Tr. 252, 254, 277, 366, 374, 380, 432). Thus, contrary to the ALJ's finding, all of plaintiff's treating physicians have supplied evidence showing that she was

18

being treated for her mental impairments throughout the relevant period. While the Sixth Circuit has explained that the failure to find a particular severe impairment at step two of the sequential evaluation process does not constitute reversible error if an ALJ finds at least one severe impairment and considers a plaintiff's other impairments in assessing the RFC, in this case the ALJ failed to assess any RFC limitations associated with plaintiff's mental impairments. *See Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987); *Winn*, 615 F. App'x at 326 (holding that ALJ's failure to find particular severe mental impairments at step two of the sequential evaluation process was reversible error because ALJ "did not consider [plaintiff's] mental impairments in a meaningful way" when assessing plaintiff's RFC).

Substantial evidence does not support the ALJ's decision to not include any RFC limitations associated with plaintiff's mental impairments. For example, Dr. Modrall's assessment shows that plaintiff sought treatment because of, *inter alia*, having "difficulty learning new tasks at work, making more mistakes than the average teller, straining friendships because people got worn out with [her] high energy style, having trouble paying bills on time, never getting around to balancing [her] checkbook, [and] losing things[.]" (Tr. 248-49). Further, to support his finding that no RFC limitations were associated with plaintiff's mental impairments, the ALJ mischaracterized Dr. Modrall's assessment by focusing only on Dr. Modrall's comment that plaintiff's "overall [IQ] scores did not demonstrate any particular difficulties with attention and concentration." (Tr. 19, 250); *see Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."). However, the ALJ did not consider the much more nuanced assessment that follows that initial comment. Specifically, Dr. Modrall went on to explain that plaintiff "did demonstrate some of the

difficulties that are usually seen in people with attention and concentration" deficits in her performance on the 13 IQ subtests. (Tr. 250). For example, Dr. Modrall indicated that plaintiff "tended to move quickly and give impulsive answers" and frequently needed to have questions repeated. (*Id.*). Dr. Modrall also determined that "[i]t was impossible for [her] to both hold information in memory and use it for computation." (*Id.*). Further, in addition to the IQ test, Dr. Modrall administered the Visual Search and Attention Test on which plaintiff performed at the second percentile and the Rapidly Recurring Target Figure Test on which plaintiff's performance was also consistent with deficits in attention and concentration. (Tr. 251). Plaintiff also performed poorly on the Tower of Hanoi exercise, which measures "the ability to direct and maintain the focus of attention, to inhibit behavior, to plan, organize, and sequence skills, and to develop initiative and drive." (*Id.*). The ALJ further mischaracterized Dr. Modrall's "recommendation for no medication" as evidence that plaintiff's ADHD was not seriously limiting. (*See* Tr. 19). What Dr. Modrall actually said was that "since [plaintiff] also ha[s] a Bipolar Disorder, [stimulant] medication may not be a good choice for [her]. While the medicine might be helpful, it might also exacerbate the symptoms of the Bipolar Disorder." (Tr. 251). Thus, Dr. Modrall's recommendation against medication to treat plaintiff's ADHD is not evidence that her ADHD is not serious, and the ALJ should have considered plaintiff's limitations in attention, concentration, and memory in assessing her RFC.

Further, the Commissioner argues that plaintiff's testimony at her hearing constitutes substantial evidence to support the ALJ's determination that her mental impairments were not severe. (Doc. 11 at 6-7). When asked what prevented her from working during the relevant period, plaintiff mentioned fatigue and fibromyalgia. (Tr. 37). However, later in the hearing, plaintiff testified that she had bipolar disorder, ADHD, and anxiety. (Tr. 52). She testified that

during the relevant period, she was depressed, she cried, she had "consistent" suicidal thoughts, and she wished she were dead. (Tr. 53). As to ADHD, she testified that it resulted in her having "[b]ad focus and concentration" and a severe lack of organizational skills. (*Id.*). She had anxiety about "the stress of an every day life" and experienced "rages" when people were not cooperating or things not going the way she expected them to. (*See* Tr. 54). She also testified that she thought people were watching her and talking about her. (*Id.*). Further, in her application, plaintiff included bipolar disorder and ADHD in the list of conditions that limited her ability to work. (*See* Tr. 187). Plaintiff's emphasis on her fatigue and fibromyalgia in response to a single question during her hearing does not negate her other testimony concerning her mental symptoms and the other evidence discussed above that those symptoms were severe and limited her ability to work. *See Vorhis-Deaton v. Comm'r of Soc. Sec.*, 34 F. Supp.3d 809, 818 n.8 (S.D. Ohio 2014) (quoting *Young v. Comm'r of Soc. Sec.*, 351 F. Supp.2d 644, 649 (E.D. Mich. 2004)) ("An ALJ cannot simply 'pick and choose' evidence in the record 'relying on some and ignoring others, without offering some rationale for his decision.'"). *See also Carroll v. Astrue*, No. 1:09-cv-1232, 2010 WL 2643420, at *9 (N.D. Ohio Jul. 1, 2010) (citing *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Rothgeb v. Astrue*, 626 F. Supp.2d 797, 808 (S.D. Ohio 2009)) ("[A]n ALJ cannot pick and choose which evidence to rely upon."). Further, in not assessing the limitations associated with plaintiff's mental impairments, "the ALJ violated the agency's promise to 'consider the combined effect of all of [plaintiff's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.'" *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 726 (6th Cir. 2014) (quoting 20 C.F.R. § 404.1523).

Thus, plaintiff's assignment of error should be sustained and this matter should be reversed and remanded for further proceedings. On remand, the ALJ should be instructed to re-weigh the evidence of plaintiff's mental impairments noted above, provide a clear and consistent rationale to support his findings, and reassess plaintiff's RFC to account for the work limitations associated with plaintiff's mental impairments.[2]

### 2. Substantial evidence does not support the ALJ's decision to give no weight to the opinions of Dr. Mousa and Dr. Santhanam, such that the ALJ failed to properly assess the RFC limitations attributable to plaintiff's fibromyalgia.

Plaintiff argues the ALJ failed to apply the "more rigorous" standard of review required under Social Security regulations for assessing the opinions of non-examining sources. (Doc. 6 at 4). Plaintiff contends the non-examining sources did not review many of her medical records, including all of Dr. Miller's records and Dr. Mousa's records from October 2008 onward. (*Id.* at 4-5). Plaintiff argues that because the non-examining sources did not examine these records, substantial evidence does not support the ALJ's decision to give their opinions significant weight. (*Id.* at 5). Plaintiff contends that Dr. Mousa's records show she was prescribed a number of different medications for her fibromyalgia, but they were not effective in relieving her fatigue. Plaintiff argues that in assessing Dr. Miller's opinion, the ALJ erred by not considering Dr. Miller's treatment of plaintiff since 2006 and Dr. Modrall's objective testing of plaintiff's ADHD. (*Id.*). Plaintiff contends that under Social Security regulations, the treating opinions of Drs. Miller, Mousa, and Santhanam are entitled to more weight than the opinions of the non-examining sources based on the length and nature of the treatment relationship,

---

[2] The undersigned finds that plaintiff has waived her argument that the ALJ failed to consider her obesity and psoriasis in assessing her RFC. Plaintiff has failed to cite any evidence or make any argument concerning the severity of these conditions, and it is not the Court's obligation to flesh out her argument for her. *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)) ("It is well-established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'"). *See also Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) ("We consider issues not fully developed and argued to be waived.").

specialization, supportability, and consistency. (*Id.* at 6). Plaintiff argues the ALJ failed to give "good reasons" as required under the regulations for discounting the disabling limitations found by her treating physicians. (*Id.*). Plaintiff contends her activities of daily living did not constitute "good reasons" for discounting those opinions. (*Id.* at 6-7). Plaintiff argues that the ALJ erred in failing to assess functional limitations associated with her extreme fatigue, which was noted in the medical records of her treating physicians. (*Id.* at 9).

The Commissioner responds that the ALJ reasonably weighed the evidence and opinions of plaintiff's treating physicians. (Doc. 11 at 3-7). The Commissioner contends the non-examining sources were not required to base their opinions on a complete or more detailed record. (*Id.* at 4). The Commissioner argues plaintiff has failed "to point to any later-submitted evidence that likely would have compelled these doctors to render more limiting assessments." (*Id.*). The Commissioner contends the ALJ gave good reasons for discounting the opinions of Dr. Mousa and Dr. Santhanam, i.e., that their opinions are unsupported by their own treatment notes and are inconsistent with other record evidence, including plaintiff's activities of daily living. (*Id.* at 5). The Commissioner argues the ALJ gave good reasons for discounting Dr. Miller's opinions, i.e., that his opinions were generated years after plaintiff's DLI, there were no treatment records to support a severe impairment prior to plaintiff's DLI, and his opinions were inconsistent with the "scant" mental health evidence that does exist for the relevant time period. (*Id.* at 5-6). The Commissioner contends the ALJ properly assessed Dr. Modrall's opinion in finding plaintiff was not prescribed medication for her ADHD and had no "particular difficulties with attention and concentration." (*Id.* at 6). The Commissioner argues the ALJ "rightly noted that at the hearing, [plaintiff] testified that she stopped working because of fibromyalgia, and did not mention her mental impairments." (*Id.* at 7).

23

The applicable regulation sets forth three types of acceptable medical sources upon which an ALJ may rely:  treating source, non-treating source, and non-examining source.  20 C.F.R. § 404.1527.  A treating source opinion on the nature and severity of a claimant's impairments is generally entitled to the most weight, and the Social Security Administration must give "good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion."  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).  "With regard to nontreating, but examining, sources, the agency will simply generally give more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined him."  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (internal citations omitted).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.  "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997).  *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.").  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records."  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic

techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion.  *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  These factors include the length, nature and extent of the treatment relationship and the frequency of examination.  20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544.  In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted).  *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 (1996)).  This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 544 (quoting *Wilson*, 378 F.3d at 544).

The ALJ gave no weight to the November 2011 opinion of Dr. Mousa, finding that it "is not supported by his treatment records . . . or consistent with [plaintiff's] significant activities of

daily living during that period that she testified to at the hearing." (Tr. 19). The ALJ also gave no weight to Dr. Santhanam's November 2011 opinion and May 2012 RFC questionnaire, finding that Dr. Santhanam's opinions are "not supported by the medical evidence, diagnostic testing, or clinical evidence during the relevant period prior to June 30, 2009. Specifically, her response is not consistent with her own treatment records beginning February 2008 or Dr. Mousa's treatment records beginning October 2008." (*Id.*).

Here, the ALJ's rejection of the opinions of Dr. Mousa and Dr. Santhanam "stems from his fundamental misunderstanding of the nature of fibromyalgia." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011) (citing *Rogers*, 486 F.3d at 243). Specifically, in finding that their opinions were not supported by their treatment records and the "medical evidence, diagnostic testing, or clinical evidence," the ALJ focused on objective evidence, noting that plaintiff "exhibited full ranges of motion, her tests were only borderline positive for ANA, her joints were only minimally positive for swelling, and all other serologies and complement levels were normal." (Tr. 18-19). The ALJ further noted: "Upon examination, she had 5/5 strength, normal gait and posture, no evidence of overt muscular wasting, her hygiene appeared normal, and there was no evidence of any synovitis, swelling, warmth, tenderness or limitation of motion of the upper or lower peripheral joints." (Tr. 19). However, none of these objective indicators would be expected in the typical case of fibromyalgia. Instead, "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243 (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia)). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have a full range of

26

motion." *Id.* at 244 (quoting *Preston*, 854 F.2d at 820). *See also Kalmbach*, 409 F. App'x at 861-62. Thus, the lack of objective evidence in the record does not constitute substantial evidence to support the ALJ's rejection of the opinions of Dr. Mousa and Dr. Santhanam as to the limitations attributable to plaintiff's fibromyalgia.

Instead, the Sixth Circuit has instructed that "[t]he process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Rogers*, 486 F.3d at 244 (citing *Preston*, 854 F.2d at 820; *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003)). Under this process, Dr. Mousa and Dr. Santhanam properly diagnosed plaintiff's fibromyalgia. Dr. Mousa noted that plaintiff was positive for 18 out of 18 focal points for tenderness in March, June, July, October, and December 2008 and in March 2009. (Tr. 253, 255, 261, 367, 375, 381). Furthermore, Dr. Santhanam ordered numerous blood tests and Dr. Mousa ordered an MRI of the brain to rule out other possible conditions. (*See* Tr. 241, 282, 376). Thus, there is no support in the record for the ALJ's rejection of Dr. Mousa's and Dr. Santhanam's opinions based on a lack of objective evidence.

Further, plaintiff's treatment records support the opinions of these treating physicians. As already noted, plaintiff was positive for 18 out of 18 focal points for tenderness at 6 appointments with Dr. Mousa during the relevant period. (Tr. 253, 255, 261, 367, 375, 381). Dr. Santhanam noted fatigue, chronic sleep problems, anxiety, and joint pain in February 2008, increased fatigue and joint pain in March 2008, chronic fatigue in April 2008, chronic fatigue and ankle/leg swelling later in 2008, and fatigue in June 2009. (Tr. 275, 277, 279, 281, 283). Unable to effectively stabilize plaintiff's condition, Dr. Santhanam referred plaintiff to Dr. Mousa, a rheumatologist. (*See* Tr. 258, 282). Dr. Mousa noted arthralgias, increasing fatigue,

symptomatic fibromyalgia, symptomatic degenerative disk disease, occasional swelling, and occasional morning stiffness in March 2008, ongoing "lingering" fatigue and symptomatic fibromyalgia in June 2008, ongoing but improved fatigue in July 2008, severe fatigue, stiffness, discomfort, and unsteady gait in October 2008, ongoing fatigue and weight gain in December 2008, and ongoing fatigue, stiffness, sleep problems that were "getting worse," weight gain, recurrent fevers at night, and tenderness in the paraspinal muscle area in March 2009. (Tr. 253-59, 362, 366-68, 374, 376, 380). Plaintiff was prescribed clobetasol propionate and Naproxen, but experienced no improvement in her symptoms. (Tr. 256, 259). Plaquenil stabilized her lupus but not her fibromyalgia. (*See* Tr. 254, 256). Plaintiff was prescribed Lyrica, but was able to tolerate only a low dose. (Tr. 252, 254). While plaintiff initially noticed improvement of her symptoms on Lyrica, she experienced a "sudden onset of severe fatigue, stiffness and discomfort" in October 2008 accompanied by an unsteady gait. (Tr. 376). In December 2008, Dr. Mousa noted that Lyrica "does help her sleep and her generalized diffuse pain" but still noted ongoing fatigue, and by March 2009 plaintiff again had increased symptoms of sleep problems, ongoing fatigue, ongoing stiffness, and recurrent fevers at night. (Tr. 362, 366-68, 374). In March 2009, Dr. Mousa discontinued Lyrica and prescribed Flexeril. (Tr. 362).

These treatment notes do not support the ALJ's conclusion that plaintiff's fibromyalgia "appeared to be stable, under control with medications, . . . and still in its early stages." (Tr. 18). Instead, these treatment notes show that plaintiff had some improvement for a brief period on Lyrica, but this improvement did not last, and her symptoms worsened throughout the relevant period. *See Lawson v. Astrue*, 695 F. Supp.2d 729, 737 (S.D. Ohio 2010) ("Fibromyalgia, like other chronic conditions, is likely to cause different magnitudes of symptoms over time, especially in view of the fact that its clinical causes are simply unknown."). The ALJ's reliance

28

on a brief period of improvement in plaintiff's symptoms to reject the opinions of Dr. Mousa and Dr. Santhanam is improper for a chronic, episodic condition like fibromyalgia. *See Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990) ("[I]n evaluating multiple sclerosis, or any other episodic disease, consideration should be given to the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities."); *Parish v. Califano*, 642 F.2d 188, 193 (6th Cir. 1981) ("In conditions which are episodic in character . . . consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals."). *See also Robinson*, 366 F.3d at 1083 ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.").

Additionally, the ALJ failed to give "good reasons" for rejecting the treating physicians' opinions. *See Cole*, 661 F.3d at 937; *Wilson*, 378 F.3d at 544. In addition to the improper focus on the lack of objective evidence to support their opinions, the ALJ also cited to plaintiff's "significant activities of daily living." (Tr. 19). Specifically, the ALJ indicated that plaintiff "testified that she would get the kids up for school, give them a bowl of cereal, talk on the telephone, use the computer, do some cleaning around the house and cook but need to sit down intermittently. She also reported that she grocery shopped and drove and that she continues to drive." (Tr. 18). Contrary to the ALJ's characterization of these activities as "significant," plaintiff actually testified that "[c]leaning is almost an impossibility for [her]." (Tr. 41). Further, she testified that she "could not stand in one spot for any length of time," could walk a block at most, and could lift five pounds at most. (*See* Tr. 41-43). She testified that "[s]tanding in front of the stove to cook something . . . was too long of a period for [her] to do." (Tr. 44). She might be able to start cooking, but then she would have to sit down and her husband or one of her

children would finish. (*Id.*). She could wash a couple of dishes at a time but would need to sit frequently, such that "[d]ishes would be a three hour[] activity." (*Id.*). She could vacuum and mop "not very well" and "not as often as needed." (*Id.*). Her ability to do household cleaning was "very limited." (*Id.*). Her husband did the laundry because "stairs were involved." (*Id.*). She did "some" grocery shopping and was able to bathe, dress, and groom herself. (Tr. 45). She woke her children up for school in the morning and then sat on the couch while they got ready. (Tr. 46-47). During the day, she sat on the couch, was on the computer "for a little bit," and talked on the phone with a friend. (Tr. 47). If she took her children out to the park, she sat while they played. (Tr. 48). She was unable to play sports or walk on a trail. She occasionally went to the movies, visited her parents, and watched her children's sporting activities. (*Id.*). The undersigned finds that "these somewhat minimal daily functions are not comparable to typical work activities." *Rogers*, 486 F.3d at 248. *See also Lawson*, 695 F. Supp.2d at 737. Further, "the ALJ's description not only mischaracterizes [plaintiff's] testimony regarding the scope of her daily activities, but also fails to examine the physical effects coextensive with their performance." *Rogers*, 486 F.3d at 248-49. Likewise, the ALJ "failed to note or comment upon the fact that [plaintiff] receives assistance for many everyday activities," such as cooking and doing laundry. *Id.* at 249. Thus, plaintiff's activities of daily living do not constitute substantial evidence for rejecting the opinions of Dr. Mousa and Dr. Santhanam.

Moreover, the ALJ failed to properly assess the regulatory factors in assessing the weight to give the treating physicians' opinions. *See* 20 C.F.R. § 404.1527(c)(2)-(6). Under these factors, their opinions are deserving of significant, if not controlling, weight. Unlike the non-examining physicians who only reviewed a portion of plaintiff's records, Dr. Santhanam and Dr. Mousa had longstanding treating relationships with plaintiff and examined her frequently.

*See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Rogers*, 486 F.3d at 244; *Wilson*, 378 F.3d at 544. Dr. Santhanam is a specialist in internal medicine, and Dr. Mousa is a specialist in rheumatology. *See* 20 C.F.R. § 404.1527(c)(5); *Rogers*, 486 F.3d at 245 ("Dr. Stein is a rheumatologist, and thus a specialist in the particular types of conditions [plaintiff] claims to suffer from."). Further, as already explained above, the opinions of Dr. Santhanam and Dr. Mousa are consistent with the record as a whole and well-supported by the medical evidence. *See* 20 C.F.R. § 404.1527(c)(3)-(4); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. Because the ALJ failed to conduct this evaluation or "provide sufficient justification for the weight given to the opinions of [plaintiff's] treating physicians, his decision in this regard did not meet the requirements of 20 C.F.R. § [404.1527], and therefore cannot serve as substantial evidence." *Rogers*, 486 F.3d at 246 (citing *Wilson*, 378 F.3d at 544).

Rather than relying on the opinions of plaintiff's treating physicians, the ALJ gave significant weight to the opinions of the non-examining state agency physicians, Dr. Cruz and Dr. Torello, who opined that plaintiff was capable of light work prior to her DLI. (Tr. 20). Yet, neither Dr. Cruz nor Dr. Torello "are treating physicians, a fact of special significance given the unique nature of fibromyalgia." *Rogers*, 486 F.3d at 245. Neither of them performed a physical exam, while treating physicians Dr. Santhanam and Dr. Mousa, who frequently examined plaintiff during the relevant period, opined that she "would be unable to maintain full-time employment." *Id.* Further, there is no indication that either Dr. Cruz or Dr. Torello are rheumatologists or have treated patients diagnosed with fibromyalgia. *See id.* More importantly, the state agency physicians offered their opinions without the benefit of all the records from the relevant period, including Dr. Mousa's treatment notes from October 2008, December 2008, and March 2009. (*See* Tr. 66, 75-76, 362-81). *See also Rogers*, 486 F.3d at 245 & n.4 (noting the

"importance of a non-examining source having a complete medical snapshot when reviewing a claimant's file"). One factor the ALJ must consider in weighing medical opinions is "the extent to which an acceptable medical source is familiar with the other information in [the] case record." 20 C.F.R. § 404.1527(c)(6). A state agency reviewing doctor's opinion may be entitled to greater weight than that of a treating or examining doctor in certain circumstances, such as when the "State agency medical . . . consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source." *Blakley*, 581 F.3d at 409 (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). However, where a non-examining source has not reviewed a significant portion of the record and the ALJ fails to indicate that he has "at least considered [that] fact before giving greater weight" to the reviewing doctor's opinion, the ALJ's decision cannot stand. *Blakley*, 581 F.3d at 409 (internal quotation omitted). Dr. Mousa's treatment notes from October 2008, December 2008, and March 2009, which the state agency physicians did not review, show that despite plaintiff's initial improvement with medication in June and July of 2008, she became increasingly symptomatic from her fibromyalgia. These later records give a more detailed picture of plaintiff's functionality than the evidence before the state agency reviewing physicians and indicate a deterioration in plaintiff's functioning that was not considered by those physicians.[3] Thus, substantial evidence does not support the ALJ's decision to give significant weight to the opinions of the non-examining sources.

---

[3] The Commissioner's citation to *Seider v. Astrue*, No. 1:11-cv-153, 2012 WL 641942 (S.D. Ohio Feb. 28, 2012), in support of the ALJ's decision to give the non-examining sources significant weight is not persuasive. Unlike *Seider*, in this case there is no examining source that supports the non-examining sources' opinions. *See Seider*, 2012 WL 641942, at *4. Further, unlike *Seider*, Dr. Mousa's additional treatment notes might have altered the non-examining sources' opinions because they show that the initial improvement noted in Dr. Mousa's records from June and July 2008 that the non-examining sources did review had given way to more severe symptoms in October 2008 and March 2009. *See id.*

Accordingly, plaintiff's assignments of error should be sustained as to the opinions of Drs. Mousa and Santhanam and this matter should be reversed and remanded for further proceedings. On remand, the ALJ should be instructed to reassess plaintiff's RFC, giving appropriate weight to the opinions of Drs. Mousa and Santhanam concerning the work limitations associated with plaintiff's fibromyalgia.

### 3. Substantial evidence does not support the ALJ's decision to give little to no weight to the opinions of Dr. Miller and Dr. Modrall

The ALJ gave no weight to Dr. Miller's November 2011 opinion, finding that "[t]his assessment is after [plaintiff's] date last insured of June 30, 2009, and there are no treatment records to support a severe impairment prior to that date. Further, the determination of disability is reserved to the Commissioner." (*Id.*). The ALJ gave little weight to Dr. Miller's August 2013 questionnaire, finding that "there are no treatment records from Dr. Miller in evidence prior to 2011." (*Id.*). The ALJ concluded that Dr. Miller's questionnaire was inconsistent with Dr. Modrall's evaluation, finding that plaintiff's "overall evaluation scores did not demonstrate any particular difficulties with attention and concentration but did reveal some difficulties with memory." (*Id.*). The ALJ noted that Dr. Modrall did not recommend medication to treat plaintiff's ADHD and commented "that the claimant was doing better since [being] on mood stabilizers for her bipolar disorder." (*Id.*). The ALJ noted that plaintiff was never hospitalized for her psychiatric conditions and had never been diagnosed with more than moderate mental impairments, as evidenced by Dr. Miller's assigning a GAF of 60 in his August 2013 questionnaire. (*Id.*).

Here, Dr. Miller gave no indication in his opinions from November 2011 and August 2013 that they related back to the period before plaintiff's DLI. (*See* Tr. 289, 432-35).

However, as noted above in the discussion of the severity of plaintiff's mental impairments, the record shows that Dr. Miller was treating plaintiff's bipolar disorder during 2008 and 2009 and may have seen her as early as 2006. (*See* Tr. 252, 254, 277, 366, 374, 380, 432). Further, as noted above, substantial evidence does not support the ALJ's conclusions concerning Dr. Modrall's assessment in determining what weight to give to Dr. Miller's opinions. The ALJ's mischaracterization of Dr. Modrall's opinion and the other evidence of plaintiff's mental health impairments does not constitute substantial evidence to support the ALJ's rejection of Dr. Miller's opinions.

Further, the ALJ again failed to consider the regulatory factors in assessing the weight to give Dr. Miller's opinions. *See* 20 C.F.R. § 404.1527(c)(2)-(6). Under these factors, his opinions may be deserving of significant, if not controlling, weight. Unlike the non-examining psychologists who only reviewed a portion of plaintiff's records—and did so without seeing any records from Dr. Miller and Dr. Modrall—Dr. Miller had a longstanding treating relationship with plaintiff and examined her frequently. (*See* Tr. 252, 254, 277, 366, 374, 380, 432); 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Rogers*, 486 F.3d at 244; *Wilson*, 378 F.3d at 544. Dr. Miller is a specialist in psychiatry. *See* 20 C.F.R. § 404.1527(c)(5). Further, as explained above, Dr. Miller's opinions, especially those stemming from plaintiff's difficulty concentrating, hyperactivity, and easy distractibility, are consistent with the record as a whole and well-supported by Dr. Modrall's objective psychological testing. *See* 20 C.F.R. § 404.1527(c)(3)-(4); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. Because the ALJ failed to properly assess the regulatory factors or "provide sufficient justification for the weight given to the opinions of [plaintiff's] treating physicians, his decision in this regard did not meet the

requirements of 20 C.F.R. § [404.1527], and therefore cannot serve as substantial evidence." *Rogers*, 486 F.3d at 246 (citing *Wilson*, 378 F.3d at 544).

Thus, plaintiff's assignment of error should be sustained as to the opinions of Dr. Miller. On remand, the ALJ should clarify whether Dr. Miller's post DLI opinions apply to the period between plaintiff's onset date and her DLI. If Dr. Miller indicates that his opinions do apply to the relevant period, the ALJ must conduct an appropriate assessment of those opinions under the regulatory factors. In any event, the ALJ must properly assess and consider Dr. Modrall's opinion in re-formulating plaintiff's RFC to account for the work limitations associated with plaintiff's mental impairments.

### 4. Whether the ALJ presented improper hypotheticals to the VE.

As discussed above, substantial evidence does not support the ALJ's rejection of the opinions of plaintiff's treating physicians or the ALJ's RFC assessment. Consequently, the hypothetical questions presented to the VE do not properly reflect plaintiff's impairments and/or limitations. Accordingly, the ALJ erred by relying on this vocational testimony to carry his burden at step five of the sequential evaluation process. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated RFC that did not accurately portray claimant's impairments). Because the ALJ's hypothetical questions failed to accurately portray plaintiff's impairments, the VE's testimony in response to those hypotheticals does not constitute substantial evidence that plaintiff could perform the work identified by the VE. Therefore, plaintiff's assignment of error should be sustained and this matter should be reversed and remanded with instructions to the ALJ to provide a hypothetical question to the VE that accurately portrays plaintiff's fibromyalgia and

mental impairments as determined by the ALJ after giving proper weight to the opinion evidence and formulating a consistent RFC.

### 5. The Court need not reach plaintiff's assignment of error concerning the ALJ's assessment of her credibility, subjective complaints, and pain.

It is not necessary to address plaintiff's final argument that the ALJ improperly assessed her credibility, subjective complaints, and pain because the ALJ's reconsideration of this matter on remand may impact the remainder of the ALJ's sequential analysis, including his assessment of plaintiff's credibility. *See Trent v. Astrue*, No. 1:09-cv-2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011). In any event, even if this assignment of error had merit, the result would be the same, i.e., remand for further proceedings and not outright reversal for benefits. *Mays v. Comm'r of Soc. Sec.*, No. 1:14-cv-647, 2015 WL 4755203, at *13 (S.D. Ohio Aug. 11, 2015) (Report and Recommendation) (Litkovitz, M.J.), *adopted*, 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015) (Dlott, J.).

## III. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). On remand, the ALJ should (1) reassess plaintiff's RFC, giving appropriate weight to the opinions of her treating physicians concerning her fibromyalgia and mental impairments; (2) reassess plaintiff's credibility, subjective complaints, and pain in light of the nature of fibromyalgia, the opinions of plaintiff's treating physicians, and plaintiff's minimal activities of daily living; and (3) pose an appropriate hypothetical or hypotheticals to a VE once the ALJ has completed a

proper assessment of plaintiff's RFC that accounts for all of plaintiff's limitations during the relevant period.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: _1/6/16_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARY E. HUBBARD,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:15-cv-148
Beckwith, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

38